# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term 2021

No. 20-3366-cv

COMMUNITY HOUSING IMPROVEMENT PROGRAM; RENT STABILIZATION ASSOCIATION OF N.Y.C., INC.; CONSTANCE NUGENT-MILLER; MYACK ASSOCIATES, LLC; VERMYCK LLC; M&G MYACK LLC; CINDY REALTY LLC; DANIELLE REALTY LLC; FOREST REALTY, LLC,

*Plaintiffs-Appellants,*

NEW YORK TENANTS AND NEIGHBORS; COMMUNITY VOICES HEARD; COALITION FOR THE HOMELESS,

*Intervenors,*

v.

CITY OF NEW YORK; RENT GUIDELINES BOARD, DAVID REISS, ARPIT GUPTA, ALEX SCHWARZ, CHRISTIAN GONZALEZ-RIVERA, CHRISTINA DEROSE, ROBERT EHRLICH, CHRISTINA SMYTH, SHEILA GARCIA, ADÁN SOLTREN,[*]

*Defendants-Appellees.*

---

[*] Several new members have been added to the Rent Guidelines Board since this case was filed and have thus been automatically substituted for the former members as the defendants in this case pursuant to Fed. R. App. P. 43(c)(2).

1

Appeal from the United States District Court
for the Eastern District of New York
No. 19 Civ. 4087 (ERK), Eric R. Komitee, District Judge, Presiding.
(Argued February 16, 2022; Decided February 6, 2023)

Before:        CALABRESI, PARKER, and CARNEY, *Circuit Judges.*

Plaintiffs-Appellants, individuals who own apartment buildings in New York City subject to the relevant Rent Stabilization Law (RSL), appeal from a judgment of the United States District Court for the Eastern District of New York (Komitee, *J.*). The court dismissed the complaint pursuant to Rule 12(b)(6). Plaintiffs-Appellants alleged that the RSL, as amended in 2019, effected, facially, an unconstitutional physical and regulatory taking. The District Court held that Plaintiffs-Appellants failed to state claims for violations of the Takings Clause. We **AFFIRM**.

---

ANDREW J. PINCUS (Timothy Bishop (Chicago), Reginald R. Goeke (Washington D.C.), Robert William Hamburg (New York City), *on the brief*), Mayer Brown LLP, for *Plaintiffs-Appellants*.

ESTER MURDUKHAYEVA, *Deputy Solicitor General for the State of New York*, Letitia James, *Attorney General for the State of New York*, Barbara D. Underwood, *Solicitor General*, Steven C. Wu, *Deputy Solicitor General*, Caroline A. Olsen, *Assistant Solicitor General, Of Counsel*, New York, N.Y., for *Defendant-Appellee RuthAnne Visnauskas,*

CLAUDE S. PLATTON, *Assistant Corporation Counsel for the City of New York*, James E. Johnson, *Corporation Counsel for the City of New York*, Richard Dearing, Jesse A. Townsend, *Of Counsel,*

New York, N.Y., for *Defendants-Appellees City of New York, Rent Guidelines Board, David Reiss, Arpit Gupta, Alex Schwarz, Christian Gonzalez-Rivera, Christina DeRose, Robert Ehrlich, Christina Smyth, , Sheila Garcia, Adán Soltren, RuthAnne Visnauskas,*

CAITLIN J. HALLIGAN (Sean P. Baldwin, Michael Duke, Babak Ghafarzade, Sophie Lipman, *on the brief*, Selendy & Gay PLLC), for *Intervenors.*

---

BARRINGTON D. PARKER, Circuit Judge:

The New York City Rent Stabilization Law ("RSL") was first enacted in 1969 as part of a decades-long legislative effort to address the myriad problems resulting from a chronic shortage of affordable housing in the City. The RSL is designed to prevent excessive rent levels and to ensure that property owners can earn a reasonable return by, among other things, capping rent increases and limiting the legal grounds for evictions. Over time, however, the Legislature has amended the law in response to changing political and economic conditions. Sometimes the statute has provided stronger protections for tenants and at other times for property owners. The RSL was most recently amended by the Housing Stability and Tenant Protection Act of 2019 ("HSTPA"). The constitutionality of this amendment and of the RSL as amended are the subject of this appeal.

The Appellants (the "Landlords") are individual property owners and not-for-profit trade associations whose members include managing agents and property owners of both rent-stabilized and non-rent-stabilized properties. They sued to invalidate the RSL and the HSTPA on the grounds that their provisions are unconstitutional because they, facially, effect a physical as well as a regulatory taking in violation of the Fifth Amendment. The Landlords further claim that the RSL and New York City's 2018 emergency declaration triggering rent stabilization are irrational in violation of the Substantive Due Process Clause of the Fourteenth Amendment. The United States District Court for the Eastern District of New York (Komitee, *J*.) held that the RSL was constitutional and dismissed the Complaint. *See* FED. R. CIV. P. 12(b)(6). This appeal followed.

## BACKGROUND

In an entirely unregulated market, rent levels are governed solely by the law of supply and demand.[1] *See* Brief for Nat'l Ass'n of Realtors as *Amicus Curiae* at 19. Such a market, however, can be unforgiving. It has little regard for the consequences it produces, whether they are inadequate returns on investment,

---

[1] The history of rent stabilization discussed here constitutes a matter of public record of which we are entitled to take judicial notice. *See Caha v. United States*, 152 U.S. 211, 222, (1894). Since this history is not part of the underlying Complaint, it does not form the basis of our Fed. R. 12(b)(6) analysis.

exorbitant rents, housing shortages, deteriorating housing stock, or homelessness. To address these problems, the City, State, and federal governments have, over the past century, regulated the New York City rental market.

The City's first rent regulations were passed in response to severe housing shortages around the time of World War I.[2] The war caused new construction to fall and rents to soar.[3] In response, renters organized rent strikes, and escalating confrontations between landlords and tenants ensued.[4] Ultimately, the State Legislature stepped in and passed the City's first rent control program in 1920, which capped rent increases and prevented evictions without cause.[5] The regime, which expired after ten years, was the subject of ongoing litigation.[6] The housing

---

[2] Robert M. Fogelson, The Great Rent Wars: New York, 1917–1929 18 (2013).

[3] Robert W. De Forest & Lawrence Veiller, The Tenement House Problem 369 (1903); "Workmen Need Homes," *New York Times*, June 9, 1918 at R92.

[4] *See e.g.,* Woman Accused of Calling Tenants in Apartment 'Scabs,'" *New York Times*, July 18, 1919 at 6; "20,000 Organize for Rent Strike," *New York Times*, April 24, 1920 at 1; "The Threatened Rent Strike," *New York Times*, April 28, 1920 at 10; "4,500 Bronx Tenants Go on Rent 'Strike,'" *New York Times,* Dec. 3, 1920 at 2.

[5] *See e.g.,* "Mayor Supports Rent Control Bill," *New York Times,* Mar. 11, 1920 at 17; "1,800 Go To Albany for Rent Fight," *New York Times*, Mar. 23, 1920 at 3; "Rent Laws in Practice," *New York Times*, April 9, 1920 at 12.

[6] *See, e.g.,* "Testing the Rent Laws," *New York Times*, Oct. 21, 1920 at 11.

problems responsible for the legislation and the litigation abated somewhat as a consequence of a resurgence of housing construction in the mid-1920s.[7]

The next regime of rent control was enacted by the federal government. In 1942, President Franklin D. Roosevelt signed into law the Emergency Price Control Act (EPCA).[8] The EPCA was passed in response to inflationary pressures brought about in part by World War II and created a nationwide system of price controls. The law froze New York City rents at 1943 levels for several years until Congress allowed it to expire, replacing it with the Federal Housing and Rent Act of 1947.[9] Under that statute, buildings constructed after February 1, 1947, were exempted from controls while older buildings remained covered.

A few years later, Congress passed the 1949 Federal Housing Act, which permitted States to take control of rent regulation.[10] Then, in 1950, New York created the Temporary State Housing Rent Commission, which regulated landlord-tenant relationships—including over 2 million rental units in the City.[11]

---

[7] *See e.g.,* "Building Revival Breaking Records," *New York Times*, July 16, 1922 at R1. "Housing Crisis Over, Surplus of Homes, Realty Men Argue," *New York Times*, Oct. 18, 1923 at 1; *Final Report of the Joint Legislative Committee on Housing*, 1923 at Ch. 1-6.

[8] *See* 56 Stat. 23 (repealed 1947).

[9] Pub. L. No. 129, 80th Cong., 1st Sess. (June 30, 1946).

[10] Pub. L. No. 171, 81st Cong., 1st Sess. (July 15, 1949).

[11] Morton J. Schussheim, High Rent Housing and Rent Control in New York City (Apr. 1958).

Those regulations touched upon, among other things, rent levels and legal grounds for evictions.

The City's modern regime of rent regulations was introduced in 1969 by the RSL. The RSL established the Rent Guidelines Board ("RGB")—an official body whose members represent the interests of landlords, tenants, and the public—which was charged with setting the amounts by which rents could be increased.[12] In carrying out this function, the RGB was obligated to consider the economic condition of the housing market, certain costs for which landlords were responsible, the returns generated to landlords, the housing supply, and increases to the cost of living.[13]

The RSL has been amended several times. In 1971, for example, the State passed the Emergency Tenant Protection Act ("ETPA"), which permits the City to renew the protections of the RSL when it declares a "housing emergency" based upon a set of statutory criteria. N.Y. Unconsol. Law tit. 23 8623.a (McKinney). Later, in the 1980s, tenants' protections were extended to their successors.[14] In

---

[12] 23 N.Y. Unconsol. Laws § 26-510(a).
[13] 23 N.Y. Unconsol. Laws § 26-510(b).
[14] 9 NYCRR 2520.6 (1987).

1993, the law was again amended to permit the deregulation of apartments that either housed high-income tenants or became vacant.[15]

Recently, the RSL was amended by the HSTPA,[16] which was passed in "response to an ongoing housing shortage crisis, as evidenced by an extremely low vacancy rate" that caused tenants to "struggle to secure safe, affordable housing" and municipalities to "struggle to protect their regulated housing stock." Sponsor's Mem., 2019 N.Y. Laws ch. 36. The HSTPA limited landlords' capacity to charge excess rent attributed to major capital improvements and individual apartment improvements. *See* 2019 N.Y. Laws ch. 36, Part K. The law repealed vacancy decontrol and high-income decontrol, which had removed units from regulation when the rent or tenant's income reached a specified level. The law also repealed certain vacancy and longevity increases, which had permitted landlords to raise rents above the otherwise allowable amounts if a unit became vacant or if a tenant had remained in place for an extended period. *See id.*, Parts B & D. In addition, the law limits landlords to recovering one rent-stabilized unit per building for personal use upon a showing of necessity, with additional restrictions

---

[15] *See generally Roberts v. Tishman Speyer Props.*, 13 N.Y.3d 270, 279 (2009).
[16] 2019 N.Y. Laws ch. 36, available at https://perma.cc/TH4B5WNQ.

when the affected tenant is a senior citizen or disabled. *See id.*, Part I. These amendments are the main subject of this appeal.

This regulatory regime has all along been the subject of sharp disagreements: landlords believed that their investment returns were too low and that they retained too little control over their properties while tenants believed that their rents were too high. Landlords in particular have consistently contended the regulations impeded their ability collect sufficient rents to fund required maintenance and improvements and to generate reasonable investment returns. Landlords have consistently contended that the RSL has failed to achieve its stated goal of increasing the availability of housing to low- and moderate-income residents.[17]

The Appellees, on the other hand, contend that the RSL did not go far enough to enable people of modest incomes to live in the City.[18] They further contend that in enacting the RSL, New York's elected representatives were well aware of the role that rent stabilized housing played in increasing the supply of apartments for low- and moderate-income residents and reducing community

---

[17] *See, e.g.*, Brief for Nat'l Apt. Ass'n and Nat'l Multifamily Hous. Council as *Amicus Curiae* 23.
[18] *See, e.g.,* Brief for Nat'l Hous. Law Project et al. as *Amicus Curiae* 12.

disruption resulting from frequent turnover, tenant dislocation, and eviction. These RSL protections, they argue, enable families to establish long-term homes and, in turn, allow neighborhoods to flourish.[19]

The City contends that the vast majority of those who benefit from rent stabilization are low- and middle-income people. In 2016, the median income for rent stabilized households was $44,560, one third lower than the median income for private, non-regulated households.[20] Of the city's 946,000 rent stabilized apartments, 189,000 units (20%) were occupied by families living below the poverty line. And more than 600,000 units (64%) were occupied by families who qualify under HUD classifications as low-income, very low-income, or extremely low-income. Eliminating rent stabilization, the Appellees contend, would undoubtedly result in a surge of homelessness. It would also result in a dynamic whereby large swaths of essential workers who help maintain our vibrant City,

---

[19] The Appellees argue that "[i]f the rent-regulated housing stock in New York continues to diminish, the homeless population will grow to unimagined levels . . . [and the] elimination of the rent laws would lead to a wave of evictions and homelessness unseen in New York since the Great Depression." Testimony of The Coalition for the Homeless before the NY State Assembly Committee on Housing, January 2011, available at https://www.coalitionforthehomeless.org/wp-content/uploads/2014/07/TestimonyRentRegulationJan202011.pdf.

[20] N.Y.C. Dep't of Hous. Pres. & Dev., Sociodemographics of Rent Stabilized Tenants 4 (2018), available at https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/rent-regulation-memo-1.pdf

including police officers, teachers, healthcare workers, and emergency service personnel, would be unable to afford to live here.[21] *See generally* Brief of District Council 37 as *Amicus Curiae*. Who has the better of these arguments is not an issue on this appeal.

Throughout its life, this regulatory regime has been the subject of continual attention in the State and City Legislatures. This is hardly surprising. Striking an appropriate balance between the sharply diverging interests of landlords and tenants involves negotiation and compromise over a very long list of complicated and difficult questions. Resolving such questions is a quintessential function of a legislature. At the end of the day, it is highly probable—indeed, virtually certain— that no interested party will be entirely satisfied by what the legislature does.

Rent regulation in the City has also been the subject of decades of litigation. Property owners have challenged New York rent control and stabilization regulations on a host of grounds, contending that it violates the Takings Clause,

---

[21] The City also argues that while sudden rent increases of any size can be difficult to absorb for tenants across income levels, even a minimal increase can be catastrophic for low-income tenants. In recent years, approximately 175,000 households in rent stabilized housing were unable to afford even a $25 increase in their monthly rent. The State and City Legislatures determined that the RSL helps guard against the dislocation of hundreds of thousands of New Yorkers. *See* Oksana Mironova, *Testimony: NYC Needs a Rent Freeze*, Cmty. Serv. Soc'y (May 5, 2020), available at https://www.cssny.org/news/entry/testimony-nyc-rgb-rent-freeze.

the Contracts Clause, the Equal Protection Clause, and the Due Process Clause. *See Harmon v. Markus*, 412 F. App'x 420 (2d Cir. 2011); *W. 95 Hous. Corp v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19 (2d Cir. 2002); *Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45 (2d Cir. 1996); *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591 (2d Cir. 1993); *Greystone Hotel Co. v. City of New York*, 13 F. Supp. 2d 524 (S.D.N.Y. 1998); *Silberman v. Biderman*, 735 F. Supp. 1138 (E.D.N.Y. 1990); *Tonwal Realties, Inc. v. Beame*, 406 F. Supp. 363 (S.D.N.Y. 1976); *Somerset-Wilshire Apts., Inc. v. Lindsay*, 304 F.Supp. 273 (S.D.N.Y. 1969); *Rent Stabilization Ass'n of New York City, Inc. v. Higgins*, 83 N.Y.2d 156 (1993); *Teeval Co. v. Stern*, 301 N.Y. 34 (1950). Each of these challenges failed.

## PROCEDURAL HISTORY

After the passage of the HSTPA, the Landlords sued the Appellees in the United States District Court for the Eastern District of New York. They alleged that the newly amended RSL effected, facially, a physical as well as a regulatory taking and that it violated the Fourteenth Amendment's Due Process Clause. While the Landlords initially raised facial and as-applied claims, the latter were abandoned. Therefore, the only claims that remain are facial challenges. A companion case, *74 Pinehurst LLC v. New York*, addresses as-applied claims brought by other landlords.

An opinion deciding that case also issues today. The defendants moved under Rule 12(b)(6) to dismiss the Complaint, and Judge Komitee granted the motion in a thorough and well-reasoned opinion. The court held that a physical taking occurs when there is a deprivation of the "entire bundle of property rights" in the property interest in question. That bundle includes the "rights to possess, use and dispose of [the property]." *Community Housing Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 43 (E.D.N.Y. 2020). The court reasoned that because the RSL restricts only the plaintiffs' right to use the property—but not to possess or dispose of it—the claims failed to make out a physical taking.

The court next turned to the substantial difficulties associated with facial regulatory takings challenges. It observed that the Landlords were unable to identify a case where a facial challenge to rent-control-related legislation had succeeded. The court acknowledged the possibility that the RSL could effect an as-applied regulatory taking, but noted that "it is unlikely that [it] will be identified in the context of a facial challenge." *Id.* at 45.

Next, applying factors set forth in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)—economic impact, interference with investment-backed expectations, and character of the governmental action—the court

13

dismissed the facial regulatory takings claim. It reasoned that the Landlords had not demonstrated that the RSL was unconstitutional in all of its applications. This appeal followed. We review *de novo* the district court's dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

## I

## A

The Landlords have leveled a facial challenge to the RSL. To prevail on a facial challenge, the plaintiff must "establish that no set of circumstances exists under which the [challenged] Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In other words, the plaintiff must show that the statute "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 449 (2008). Facial challenges to the RSL have regularly fallen short of this high bar. *See, e.g.*, *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d at 595; *W. 95 Hous. Corp.*, 31 F. App'x at 21. The Landlords suggest, however, that this is no longer the correct standard to apply to the facial challenges they bring. They contend that, instead of applying *Salerno*'s well-established standard, this Court should utilize one of two more lenient approaches to striking down statutes on a facial challenge. We disagree.

14

They first argue that because "'[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant,'" the facial challenge should focus on the law's effect on only those landlords who wish not to comply with its strictures. Appellants' Br. at 35 (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015)). A close reading of *Patel* makes clear that, when the Supreme Court referenced "the group for whom the law is a restriction," it meant those to whom the law *actually applies*, not those for whom it has no plausible application—that is, those for whom the law is "irrelevant." *Patel*, 576 U.S. at 419.

In *Patel*, the Supreme Court considered a facial challenge to a statute authorizing certain warrantless searches. *Id*. at 417. In response to the challenge, the City cited situations in which a warrant was not required under already established law: that is, "situations where police are responding to an emergency, where the subject of the search consents to the intrusion, and where police are acting under a court-ordered warrant." *Id*. at 417–18. It argued that those situations showed that a warrantless search was permissible in some circumstances, and so the new law permitting certain warrantless searches could not be "unconstitutional in all of its applications," as *Salerno* required. *Id.* The Court

rejected this argument, reasoning that when faced with exigent circumstances or a court-ordered warrant, "the subject of the search must permit it to proceed irrespective of whether it is authorized by statute." *Id*. at 418–19. The Court distinguished the City's examples as "irrelevant to our analysis because they do not involve actual applications of the statute." *Id*. at 419. Thus, by defining the focus of a facial challenge as resting on its effect on those "for whom the law is a restriction," the Supreme Court merely clarified that facial challenges to a statute must establish its unconstitutionality in all "applications of the statute *in which it actually authorizes or prohibits conduct*." *Id*. at 418 (emphasis added). The Court's decision in *Patel*, therefore, only clarified the scope of *Salerno*'s standard for facial challenges. It did not reject or relax the *Salerno* standard.

As a separate basis for avoiding the rigors of *Salerno*, the Landlords rely on *United States v. Stevens*, 559 U.S. 460 (2010), arguing that to succeed on their facial challenge, they need only establish *either* "'that no set of circumstances exists under which [the statute] would be valid, *or* that the statute lacks any plainly legitimate sweep.'" Appellants' Br. at 35 (quoting *Stevens*, 559 U.S. at 472) (emphasis in brief). The Landlords contend that, in its use of the phrase "plainly legitimate sweep," the *Stevens* Court held that a facial challenge in any legal

domain can succeed by meeting either one of these two standards. Again, we are not persuaded.

In *Stevens*, a criminal defendant challenged the statute of his conviction—criminalizing the creation, sale, or possession of depictions of animal cruelty—as facially invalid under the First Amendment. 559 U.S. at 464–65, 467. But in assessing the challenge, the Supreme Court stated that the choice between the two standards under discussion (valid in "no set of circumstances" or "lacking any plainly legitimate sweep") was "a matter of dispute that we need not and do not address." *Id.* at 472. Thus, it did no more than recognize that "[i]n the First Amendment context," it has determined that "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 472 (quoting *Wash. State Grange*, 552 U.S. at 449 n.6).

We understand *Stevens*, then, not as rejecting *Salerno*'s demanding standards for facial challenges generally, but as reinforcing the principles that (i) *Salerno* provides the prevailing standard for facial challenges to statutes outside the context of the First Amendment, and (ii) a different, more challenge-friendly standard has developed in the context of statutes affecting First Amendment

rights. Neither *Stevens* nor any other case the Landlords cite has applied this relaxed standard outside of the First Amendment context, nor supports its extension beyond that setting. Indeed, in observing that "[f]acial challenges are disfavored for several reasons," the Supreme Court reminded us that "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451. Especially where, as here in the rent stabilization context, the regulatory regime at issue has both persisted and been adjusted over time, reflecting finely tuned, legislative judgments, we must exercise caution in entertaining facial challenges. Neither *Patel* nor *Stevens*, thus, lower the high bar the Landlords must satisfy to assert a facial challenge.

## B

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amends. V, XIV, § 1. That requirement applies to all physical appropriations of property by the government. *See Horne v. Dep't of Agriculture*, 576 U.S. 350, 360 (2015). When the government effects a physical appropriation of private property

for itself or another—whether by law, regulation, or another means—a *per se* physical taking has occurred. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). Examples of physical takings include using eminent domain to condemn property, s*ee United States v. General Motors Corp.*, 323 U.S. 373, 374–75 (1945); taking possession of property without taking title to it, *see United States v. Pewee Coal Co.*, 341 U.S. 114, 115–17 (1951); and occupying property by, for example, building a dam that causes recurring flooding, s*ee United States v. Cress*, 243 U.S. 316, 327–28 (1917).

The Supreme Court has, over the years, considered various Takings Clause challenges to government actions. *See e.g., Griggs v. Allegheny Cnty., Pa.*, 369 U.S. 84 (1962); *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987); *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012). In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Supreme Court considered a statute requiring landlords to permit cable companies to install equipment on the landlords' properties. The Court held that such a mandatory invasion amounted to a permanent physical occupation by a third party—the cable companies—of the landlords' properties and was therefore a *per se* physical taking. In addition, the

Court concluded that such a physical occupation deprived landlords of the entire "bundle of rights" associated with owning property. *Id.* at 435.

A decade later, in *Yee v. City of Escondido*, 503 U.S. 519 (1992), the Court declined to apply to this logic to rent-control laws and rejected a Takings Clause challenge. *Yee* involved a mobile-home rent control ordinance that set rent at below-market rates. The Court held that the ordinance—even considered in conjunction with other state laws effectively permitting tenants to remain at will—was not a physical taking. It reasoned that the statutes did not facially *require* landlords to rent their properties in perpetuity because evictions were permitted in some conditions, *id.* at 528, and because the "tenants were invited by petitioners, not forced upon them by the government," *id.* The Court further noted that States have wide latitude to regulate the landlord-tenant relationship, such as by placing "ceilings on the rents the landowner can charge or requiring the landowner to accept tenants he does not like." *Id.* at 529 (cleaned up).

In *Horne*, in contrast, the Court found that a physical taking had occurred. In that case the Court considered a challenge to a Department of Agriculture marketing order requiring raisin growers to hand over a percentage of their crop to the government. 576 U.S. at 350. The Court held that the statute effected a

physical taking because raisins are physically transferred from the growers to the government and title is passed, thereby depriving owners of the entire bundle of rights to their property. *Id*. at 361. The Court also held that the government cannot condition a party's permission to engage in interstate commerce on complying with a regulation that effects a physical taking. *Id.* at 364–67.

Most recently, in *Cedar Point* the Court evaluated a regulation granting labor organizations the "right to take access" to an agricultural employer's property for up to 120 days a year to solicit support for unionization. 141 S. Ct. at 2069. The Court held that because the regulation granted a right to invade the grower's property it amounted to a *per se* physical taking. *Id.* at 2072. *Cedar Point*, however, emphasized that "[l]imitations on how a business generally open to the public may treat individuals … are readily distinguishable from regulations granting a right to invade property closed to the public." *Id.* at 2076–77.

Our court has also considered various Takings Clause challenges to regulations, including some to earlier versions of New York's RSL. *See, e.g., Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 94–95 (2d Cir. 1992) (finding that denying a land use permit did not constitute a physical taking); *Fed. Home Loan Mortg. Corp.,* 83 F.3d at 48 (finding application of rent stabilization laws to a

previously exempt building did not violate the Takings Clause); *Harmon*, 412 F. App'x at 422 (holding City's rent stabilization law did not effect a permanent physical occupation of a landlords' property in violation of Takings Clause).

## B

Applying these principles, we conclude that no provision of the RSL effects, facially, a physical occupation of the Landlords' properties. In *Cedar Point*, the Court held that the government may effect a physical occupation of property by granting a third party the right to invade "property closed to the public." 141 S. Ct. at 2077.[22] That has not occurred here. Rather, the Landlords voluntarily invited third parties to use their properties, and as the Court explained in *Cedar Point*, regulations concerning such properties are "readily distinguishable" from those compelling invasions of properties closed to the public. *Id.* As the Supreme Court made pellucid in *Yee*, when, as here, "a landowner decides to rent his land to tenants" the States "have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation

---

[22] We reject Appellants' reliance on the Supreme Court's per curiam opinion in *Pakdel v. City and County of San Francisco*, 141 S. Ct. 2226 (2021). There, the district court had ruled on the merits of physical takings claims prior to the Supreme Court's ruling in *Cedar Point Nursery*, and therefore the Court in remanding the case merely stated that the Ninth Circuit "may give further consideration to these claims in light of [the] recent decision in *Cedar Point Nursery v. Hassid*." 141 S. Ct. at 2229 n. 1. That directive is of no moment here.

for all economic injuries that such regulation entails." 503 U.S. at 528–29; *see also Loretto,* 458 U.S. at 440 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."); *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398 (1934); *Edgar A. Levy Leasing Co. v. Siegel,* 258 U.S. 242 (1922). The numerous cases that affirm the validity of rent control statutes are the necessary result of this long line of consistent authority. *See, e.g., Bowles v. Willingham,* 321 U.S. 503 (1944); *Block v. Hirsh,* 256 U.S. 135 (1921).

Nor does the RSL compel the Landlords "to refrain in perpetuity from terminating a tenancy." *Yee,* 503 U.S. at 528. The statute sets forth several grounds on which a landlord may terminate a lease. These include failing to pay rent, creating a nuisance, violating provisions of the lease, or using the property for illegal purposes. 9 NYCRR § 2524.3. It is well settled that limitations on the termination of a tenancy do not effect a taking so long as there is a possible route to an eviction. *Cf. Yee,* 503 U.S. at 528 (concluding that a statute requiring that evictions be given with 6- or 12-months' notice is not a compelled physical invasion in violation of the Takings Clause); *Harmon,* 412 F. App'x at 422 (finding

New York's rental stabilization law at the time did not give rise to a physical taking partially because the landlords retained the right to "evict an unsatisfactory tenant"); *Higgins*, 83 N.Y.2d at 172 (family succession amendments to rent control and rent stabilization regulations did not effect unconstitutional taking where owner's right to evict unsatisfactory tenant was not altered); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 163 (S.D.N.Y. 2020) (finding that a temporary halt on evictions did not amount to a physical taking).[23]

All in all, as with previous versions, the RSL "regulates land use rather than effecting a physical occupation." *W. 95 Hous. Corp.*, 31 F. App'x at 21. The caselaw is exceptionally clear that legislatures enjoy broad authority to regulate land use without running afoul of the Fifth Amendment's bar on physical takings. *See Yee*, 503 U.S. at 527.

## C

The Landlords contend that the RSL effects, facially, a physical taking because it requires them to offer tenants renewal leases, interferes with their ability to evict tenants and reclaim units for personal use, and allows tenancies to be

---

[23] Because we conclude that the Landlords have not been deprived of their right to exclude, we agree with the District Court that they have not been deprived of their "entire bundle of rights" in their properties.

transferred to successors. These provisions, according to the Landlords, amount to a permanent physical occupation compelled by the government.

We disagree. None of these provisions involve unconditional requirements imposed by the legislature. Landlords, instead, must adhere to these provisions only when certain conditions are met. Consider, for example, the statute's successorship provisions. No tenant enjoys an unfettered right to transfer tenancy rights to a successor. Instead, the successor must meet a host of requirements, such as, for example, being a member of the tenant's family who has already lived in the apartment for two years. What is more, even assuming *arguendo* that the successorship provisions do unconditionally require landlords to rent to uninvited successors, that would deprive the Landlords only of the ability to decide *who* their incoming tenants are. That limitation, as the Supreme Court has recognized, has "nothing to do with whether [a law or regulation] causes a physical taking." *Id.* at 530–31.

Furthermore, none of the caselaw on which the Landlords rely lends any appreciable support to their contention that the RSL effects, facially, a physical taking. The Landlords' reliance on *Loretto, Horne,* and *Cedar Point,* their main authority, is misplaced for a common reason: None of them concerns a statute that

25

regulates the landlord-tenant relationship, and none restricts—much less upends—the State's longstanding authority to regulate that relationship.[24]

Moreover, *Yee*, the only case on which the Landlords rely that does involve a statute regulating the landlord-tenant relationship, confirms our conclusion. *Yee*, as noted, involved a facial challenge to rent control statutes that limited owners' ability to terminate tenancies where the initial tenant had transferred her rights to another. 503 U.S. at 523–24. Like the Landlords here, the petitioners argued that the law effectively forced property owners to rent the property out to these individuals and prevented owners from changing the use of their property. The Court upheld the law because it merely limited—but did not bar—an owners' ability to do both of these things. *Id*. at 527–28. The same is true here.

## II

The Landlords also mount a facial regulatory taking challenge to the RSL. Legislation effects a regulatory taking when it goes "too far" in restricting a landowner's ability to use his own property. *Horne*, 576 U.S. at 360; *Yee*, 503 U.S. at

---

[24] Nor is the Landlords' position supported by their reliance on *Horne* for the proposition that the "voluntary participation in the market [cannot] excuse or absolve the government of liability for a taking." Like the District Court, we reject Appellants' claims not because we conclude that they have acquiesced in a physical taking, but because "no physical taking has occurred in the first place."

529; *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). In determining whether a use restriction effects a taking, we apply the balancing test set out in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978), a case involving a challenge to New York City's historical preservation law, N.Y.C. Admin. Code, ch. 8–A, § 205–1.0 et seq. (1976).[25]

*Penn Central* instructs courts to engage in a flexible, "ad hoc, factual inquir[y]" focused on "several factors that have particular significance." 438 U.S. at 124. Three of them are: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Id.* The Landlords assert that, taken together, these factors support their characterization of the RSL as a facial regulatory taking. We disagree.

---

[25] We are unpersuaded by the Landlords' argument that the appropriate standard under which to determine whether a taking has occurred comes from a dissent in *Pennell v. City of San Jose*, 485 U.S. 1 (1988). As we have noted, "Justice Scalia's [*Pennell*] dissent was just that; a majority of the Supreme Court has yet to adopt Justice Scalia's reasoning." *Garelick v. Sullivan*, 987 F.2d 913, 918 (2d Cir. 1993). This dissent, we have pointed out, is "in tension (if not conflict) with well established Fifth Amendment doctrine granting government broad power to determine the proper subjects of and purposes for regulatory schemes." *Id.* Accordingly, we decline to employ a test that has never been adopted by the Supreme Court.

As to the economic impact of the regulation, the Landlords contend that the RSL has a direct and substantial negative economic impact on rent-stabilized properties in New York City because stabilized rents are on average 25% lower than market rents and permissible rent increases are outpaced by increases in operating costs. In short, the Landlords contend that the RSL forces property owners to choose between making losing investments or letting their properties deteriorate. They allege that rent-stabilized properties are worth 25% to 50% less than similar properties with market-rate units.

The RSL may well have an appreciable economic impact on the profitability of some buildings subject to its provisions. When permissible rent increases are outpaced by operating cost increases, the result may be a reduction or, in some cases, the elimination of net operating income. We acknowledge that some property owners may be legitimately aggrieved by the diminished value of their rent-stabilized properties as compared with their market-rate units. Furthermore, we understand that many economists argue that rent control laws are an inefficient way of ensuring a supply of affordable housing. But while legislative judgments may take into account these varying policy perspectives, we are bound to follow the standard set forth for a facial regulatory taking under *Penn Central*. Appellants

have simply not plausibly alleged that every owner of a rent-stabilized property has suffered an adverse economic impact that would support their facial regulatory takings claims. Thus, Appellants did not plausibly allege the economic impact factor on a facial basis, and this factor thus weighs against the conclusion that the RSL effects a regulatory taking on its face.

Instead of alleging that every landlord has suffered an adverse economic impact, the Landlords principally rely on data purporting to show the average economic effects of the RSL. But these effects do not establish that the RSL can never be applied constitutionally, which is the requirement for a facial challenge. As the Supreme Court stated in *Concrete Pipe & Prods. of Cal.*, the "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 645 (1993); *see also Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139–40 (2d Cir. 1984) (collecting cases rejecting takings claims where property value declined by 75% to 90%). We therefore conclude that the economic impact factor of the *Penn Central* analysis does not support the Landlords.

With respect to the Landlords' investment-backed expectations, once again, we can assume *arguendo* that some property owners may have had their

investment-backed expectations thwarted by the current iteration of the RSL. Thus, we may assume some property owners may not have expected, for example, that the 2019 RSL would eliminate the possibility of preferential rent increases or sunset provisions. However, the Landlords have failed to establish that the RSL interferes with *every* property owner's investment-backed expectations, which is required on a facial challenge, because such expectations can be assessed only on a case-by-case basis.

Different landlords, who purchased properties at different times and under different RSL regimes, will necessarily have a range of differing expectations. Some may have been aggrieved by various provisions of the RSL, while others may not have been and, indeed, others may have seen the profitability of their investments rise. It is therefore impracticable to assess a class of owners' expectations without analysis on an individualized basis. Moreover, we must consider the reasonableness of alleged investment-backed expectations vis-à-vis those who can "demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (internal quotation marks omitted). We cannot make that analysis on a groupwide basis in a case where, as here, the challenged

30

statute has been in place for half a century, and most, if not all, current landlords purchased their properties knowing they would be subject to the RSL. Given the RSL's ever-changing requirements, no property owner could reasonably expect the continuation of any particular combination of RSL provisions. As the New York Court of Appeals has noted, "no party doing business in a regulated environment like the New York City rental market can expect the RSL to remain static." *Matter of Regina Metro. Co., LLC v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 369 (2020). Accordingly, we conclude that the investment-backed expectations factor does not support the contention that the RSL has effected, facially, a regulatory taking.

Turning to the character of the taking, a regulatory taking "may more readily be found when the interference with property can be characterized as a physical invasion by government." *Penn Central*, 438 U.S. at 124. The Landlords argue that the RSL constitutes a physical invasion because it burdens property owners with non-removable tenants and, in so doing, eliminates landlords' rights to determine the use of their property or to use it themselves. They contend that the RSL confers a local public assistance benefit on tenants that is inappropriately funded by a subset of New York City building owners rather than the government.

We are not persuaded. The Supreme Court has instructed that in analyzing the "character" of the governmental action, courts should focus on the extent to which a regulation was "enacted solely for the benefit of private parties" as opposed to a legislative desire to serve "important public interests." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987). The character of the government action in *Penn Central*, for example, cut against a finding of a taking because the law was part of a "comprehensive plan to preserve structures of historic or aesthetic interest" and applied to hundreds of sites. 438 U.S. at 132. In reaching this conclusion, the Court relied on the "judgment of the New York City Council that the preservation of landmarks benefits all New York citizens and all structures, both economically and by improving the quality of life in the city as a whole." *Id.* at 134.

Here too, the RSL is part of a comprehensive regulatory regime that governs nearly one million units. Like the broad public interests at issue in *Penn Central*, here, the legislature has determined that the RSL is necessary to prevent "serious threats to the public health, safety and general welfare." N.Y.C. Admin. Code § 26-501. No one can seriously contend that these are not important public interests and courts are not in the business of second-guessing legislative determinations such

as this one. The fact that the RSL affects landlords unevenly is of no moment because, as the *Penn Central* Court noted, "[l]egislation designed to promote the general welfare commonly burdens some more than others." 438 U.S. at 133. Accordingly, the character of the regulation does not support the conclusion that the RSL effects a regulatory taking.

Finally, the Landlords urge this Court to consider two additional, less commonly cited *Penn Central* factors that, they argue, tend to show that the RSL results in a regulatory taking: noxious use and a lack of a reciprocal advantage. Even assuming for the sake of argument that these factors apply, the claims fail.

First, the Landlords assert that because the RSL does not address a safety issue or "noxious use" of a property, this factor supports the conclusion that a regulatory taking has occurred. This argument relies on a logical fallacy that because noxious use laws typically do not constitute takings, the RSL must be a taking because it does not govern noxious use. We have never held that *only* regulations of noxious uses can survive takings challenges. Merely because the existence of noxious use regulation can overcome a takings challenge does not mean that, conversely, the lack of noxious use regulation supports a takings challenge. Accordingly, this factor does not support the Landlords' takings claim.

The Landlords' reliance on the "reciprocity of advantage" factor fares no better. Citing Justice Rehnquist's dissent in *Penn Central*, they argue that the RSL effects a regulatory taking because the Fifth Amendment prohibits the placing of an inordinate share of a public burden on a private individual. With this argument, the Landlords urge us to read a dissent as providing us with governing law. We can't do that. As the legislature has found, the RSL provides reciprocity of advantage: the RSL results in significant state- and citywide benefits—including to landlords—by preventing tenant dislocation and preserving neighborhood stability. Although what specific value a particular landlord receives from these benefits may be hard to quantify, that difficulty does not render the RSL a taking. As the Court said in *Keystone Bituminous Coal Ass'n*, "[t]he Takings Clause has never been read to require the States or the courts to calculate whether a specific individual has suffered burdens under this generic rule in excess of the benefits received." 480 U.S. at 491 n.21. Accordingly, a supposed lack of a reciprocal advantage does not render the RSL a regulatory taking.

## III

Finally, the Landlords contend that they have plausibly alleged that the RSL and the 2018 City Council emergency declaration violate the Due Process Clause

of the Fourteenth Amendment. Again, we disagree. The Landlords argue that the RSL is not "rationally related" to alleviating the housing shortage, securing housing for low-income residents, addressing rent profiteering, or promoting neighborhood stability. To the contrary, the Landlords say, the law reduces the housing supply, secures housing for the wealthy, increases rent for uncontrolled units, and discriminates in favor of tenants over owners. Supporting their view, the Landlords, as we have seen, point to various economists who argue that the RSL, in several respects, causes more harm than good.

But as the Supreme Court has noted, the Due Process Clause cannot "do the work of the Takings Clause" because "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 720–21 (2010) (cleaned up); *see Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Harmon*, 412 F. App'x at 423. In any event, as the Court has noted, the liberties protected by due process "do not include economic liberties." *Stop the Beach*, 560 U.S. at 721.

Furthermore, even if a due process challenge were available, Appellants' arguments would still fail. In evaluating a due process challenge, we would conduct a rational-basis review, *see Pennell*, 485 U.S. at 11–12, which requires a law to be "rationally related to legitimate government interests," *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). A rational basis review is not a mechanism for judges to second guess legislative judgment even when, as here, they may conflict in part with the opinions of some experts. *See, e.g.*, *F.C.C. v. Breach Communications, Inc.*, 508 U.S. 307, 313–14 (1993) ("Where there are plausible reasons for Congress' action, our inquiry is at an end.") (internal quotation marks omitted). Rather, it is a deferential standard that allows a law to survive if *any* of its justifications is valid. *See Preseault v. I.C.C.*, 494 U.S. 1, 18 (1990). Here, the RSL was primarily enacted to permit low- and moderate-income people to reside in New York City when they otherwise could not afford to do so. *See* N.Y.C. Admin. Code § 26-501. It is beyond dispute that neighborhood continuity and stability are valid bases for enacting a law. *See Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992). Appellants' Due Process challenge thus fails.

## CONCLUSION

For these reasons, we **AFFIRM** the judgment of the District Court.

36